Good morning. My name is Alexandra Nagan and I represent the appellant Danny Nazareno. I would intend to reserve a couple minutes for rebuttal. There are two reasons why the police violated Mr. Nazareno's Fourth Amendment rights in this case. When they took him from the parking lot where they arrested him up to an apartment to conduct a parole search in this case. First, the police did not have probable cause to believe that Mr. Nazareno resided in the apartment at the time they searched it. And second, the search was conducted prior to the police knowing that Mr. Nazareno was on searchable parole. For these reasons, this Court should reverse the district court's denial of Mr. Nazareno's motion to suppress. Brief facts in this case are important because what the police knew at the time that they encountered Mr. Nazareno was that he was a suspect in a theft case and they positively identified him as being that person. They had probable cause to arrest him at that point and they did that. That was outside in a parking lot, not in an apartment, not near an apartment that they saw. Well, they'd encountered him first on the stairway in the apartment complex, an exterior staircase in the apartment complex? I believe they saw him first in the parking lot and then began to interact with him while he was going upstairs, yes. Right. So we've got him associated with the apartment complex, at least outside of the apartments. Yes. He's not yet in 206, but he's there. Correct. And I believe that they had information, they did have information from the, I'm going to call her the girlfriend's mother, that their suspect was associated with the person that lived in the apartment. Well, it even goes a little further, doesn't it? The video surveillance tapes show that when he made his getaway, that he climbed in the car that was, that the mother identified as belonging to the daughter. The mother bought it, the license plate checked out the mother, they checked the mother, the mother said, it's my daughter's car. So it's the daughter's car and he gets in a getaway car with the daughter's car. Correct. Absolutely. And the daughter lives in that complex. She does. And, and under the best case scenario, the police had information that Mr. Nazarino, from one of the police officers, there was contradictory testimony, but from one of the police officers, the police testified that they had information that the mother told them that Mr. Nazarino stayed with her. Our point being that stayed with is not enough. Under the case law that we have for the stringent standard for probable cause to believe that a person resides somewhere, that this court should find that staying there is not enough. And the case law Is staying a modern or an old traditional Victorian term? I mean, are we talking about staying or staying? Well, I think, Your Honor, even in the case where a person is clearly staying because he's appearing at the door in his boxer shorts, which is one of the Ninth Circuit cases here, that that wasn't enough because that's not enough to believe the person actually resides there and residing is the key. Well, there was, there was a time when they did verify that, but it was after they had gone in the apartment. So what was, so you're saying at the time that they eventually confronted him, got him, the only new, a limited amount about where his residence was and the best evidence you say is stayed with, staying with. Right. I submit to the court that the best evidence on this record is that the district court had was that the, that one police officer testified that he believed that Mr. Nazarino stayed there. And that was based on several things. There was very contradictory evidence in the testimony. The two police officers testified starkly differently from each other. One police officer testified at the time they encountered Mr. Nazarino, they had absolutely no reason to believe that he lived there. The other officer testified that they had information from Barry, from the mother and also from the apartment manager that he might have stayed there. But even, that's not going to be enough on a clear air standard. No, and I, right. And I, we didn't argue that in our brief because I think the court, the important thing is that the court should find that stayed in is not enough when there's nothing else. There is nothing else here that we, there's no question. There's nothing else here. There's no key to the apartment. There's no information from any other source that, that, that this is this person's residence because these are not, well, no, I'm not sure that that's quite right. I mean, we've already gone over it. So it's not as though it's evidence that you're ignoring, but they found him there. True. So they found him across town. It's true, but stayed there. And it's clear the best evidence on, on this record is that he stayed there, but that I'm submitting to this court, that is not enough. There is simply not enough. Didn't the apartment manager, even though there was some dispute about how he said or what he remembered, it seemed to me he never identified specifically the defendant. Sure. But he said, I think he said he thought that there was a male staying with, well, you know, again, we're back to that old staying thing. I mean, how long do you have to stay before you're a resident? I mean, if, if I'm homeless and I stay there for a month, am I, am I a residence? Am I a residence? We don't know. It isn't enough again for clear error. You don't have to find clear error in this case. That's, it's, you do not have to find clear error. You can find that the district court found that they had information that he stayed there, but this, that, that's still not enough for the parole search in this case because the standard of resided, it's, it's so different from temporarily staying somewhere that the person, that has to be the person's home. Nobody said summarily staying. They said he stayed with her or was staying with her. That's the best evidence on the record. And the standard is probable cause to believe, right? So, so part of it is probable cause to believe that it's this person and they're pretty, they've got a lot of evidence on that. But also in going into the probable cause is probable cause to believe that the word stayed as used here means lived with. Right. But if the court looks at the case law about residing, there are a lot of cases with a lot stronger facts that fall short of the resided, of the probable cause standard to believe that the person resided there. And, and that's the problem is that the, the case law that the court has before it requires quite a bit before the officers can make the conclusion that a person is residing there. And a lot of those facts, like the person actually physically being there in their underwear, the person being seen coming and going from the place, those kind of facts that the police have before they, they do the search aren't enough. And so certainly the argument in this case is that without more, stayed, it's just the word stayed is simply not enough without more clarification. The police never did ask, according to their testimony, there was no evidence that they ever did try to ascertain. And, and probably because in this case the parole search wasn't the initial intent. The initial intent was to go find this person. Not having, nothing to do with the fact that he was on parole. They had no idea he was on parole until, until they showed up and, and arrested him. And that's the, the second point of the argument here was that they did, Mr. Nazarino himself answered that he was on parole. But before they did this, this sweep that did recover, uncover incriminating evidence, they actually did not know that he was on California parole. They knew from his word that he was on, his answer to the question outside of the apartment that he was on parole. Your Honors, both these points add up to fall short. And, and that's the point in this case is that this simply isn't enough to cross the line to where these police officers could then do a parole search. Particularly in this, in the facts of this case where Mr. Nazarino's not even in the apartment. It's a much different case if Mr. Nazarino is in the apartment, if they know about the parole ahead of time. Yes, sir. I, I was just checking and, and this, I want to check something with, with supposedly citing to the record in the briefs. The, according to Gilliam's testimony, they, he spoke to the manager. The manager reported that Nicole Roca still had the car and was staying in apartment number 206 with a man. Now, is that accurate? Is there other, that's what I read, I'm reading in the briefs. Now, I haven't gone back and rechecked that ER, but what, what does it mean when the manager says that she has to sell the car, which means the car that was used in the apartment, and that she was staying in apartment 206 with a man, staying in the apartment. That sounds like residence to me. Well, they know he, they know she's living there. Excuse me? They know she's living there. They know Ms. Rocha's living there. Well, they said staying with a man. He says that he believes a man is staying there and I'm. He didn't, I agree. He didn't identify the defendant, but he said she was staying there with a man. Right. And I'm submitting to the court that that's not enough for residence. But if she's staying there, let's say if he says she's staying there and obviously she's living there and he, and the guy who says this knows she's living there, I mean, inference upon inference, but he's obviously using the word stay to mean live because he knows she lives there. And instead he says she's staying there. Right. We don't, we don't know. Right. I mean, the problem in this case, and I'm, I am running out of time, but the problem in this case is that the police officers needed more and that it falls short. And so I've reserved. Why don't we hear from the other side? I'll give you a minute. Thank you. Good morning. May it please the court. I'm Camille Skipper, assistant U.S. attorney appearing on behalf of the United States. To address that last point specifically, in the excerpt of record at page 54, the testimony of the apartment manager, he says then in response to a question, and did you tell the police that the man in the photograph looked like a man that was living in apartment 206 with Ms. Rocha? His answer, no, because I didn't even recognize him. I didn't know. I never seen him when he moved in. Question. Did you think it was a guy that moved in? Answer. There was one guy there. I knew that. That there was somebody living there, but I didn't know who it was. The. So he testifies that whoever the guy is, he's living there. Yes, Your Honor. And we know independently who the guy is. Yes, Your Honor. That's the argument. Yes, Your Honor. Okay. In fact, on cross-examination, the defendant testified that he did in fact live there, that that was his only residence, and that it was his official residence. Yeah, but that doesn't count, because the question is not whether he lived there. The question is whether the officers at the time they go in have reasonable cause to believe he lives there. Yes, Your Honor. I'm just pointing out the fact that it's consistent. In this case, the district court did its job. It was confronted with contested facts, so it held an evidentiary hearing. At the evidentiary hearing, Judge Garcia carefully considered the demeanor as well as the testimony of each of the witnesses, and that is borne out by his comments in his ruling. He made credibility determinations on the record, and he made detailed findings of fact before he ruled in this case. And the findings of fact are supported by his explicit credibility findings, particularly with regard to Ms. Roca, Laura Roca, Nicole Roca's mother, and the apartment manager. By the time the defendants met, I'm sorry, but by the time the detectives met the defendant, they had a reasonable belief that he lived with Ms. Roca. Her mother had told the detectives that he did. The apartment manager confirmed that there was at least a man living there, even though he couldn't confirm that it was the defendant. And, as the court has pointed out, the detectives saw the defendant walking toward the apartment. When they identified himself, he began to run toward the apartment. Taken together, that does give the officers a reasonable belief that he lived in the apartment even before they spoke to him. And Detective Scioli said that when he asked the defendant, the defendant identified the apartment as where he lived and that he lived there with his girlfriend. Of course, none of this is surprising because he did, in fact, live there, and I know that that's an after-the-fact observation, but it certainly shows the consistency. Did he admit that to the officers before they went in the apartment? Detective Scioli says that the defendant told him that he was on parole and that he lived in the apartment with his girlfriend. But that was before they got in the apartment? Yes, Your Honor. Well, where's that testimony? Yeah, where is that? I thought it was after he was in the apartment. It appears in, and I'm looking at my brief for this, on page 7, in the record, in the excerpt of record number, page 23. Yeah, I see it on page 9.     Page 9. Page 9. Page 9. Page 9. I'm sorry, that's actually Detective Gillum's testimony. Yes, and it seems as though it was Coley who stopped him, placed his hand on his gun, and put him in handcuffs. Yes. And apparently, he had the conversation that Gillum didn't hear outside of the apartment, and he told him that he lived in that apartment and he was on parole. On page 7, I'm actually referring to Detective Coley's testimony directly, in which he asked the defendant if he stayed in the apartment, and the defendant responded that he stayed there with his girlfriend. Yeah, but the word stayed. Now, I'm not sure I attach a lot of distinction to the difference between stayed and lived, but the answer is, and what was the answer to that answer? Yes, he stayed there with his girlfriend. He stayed there with his girlfriend. Stayed. I mean, whoa, that answer has stayed three times. So if stayed doesn't mean lived, we maybe have a problem. On the other hand, it seems to me that stayed is so close to lived, and that's a rough synonym that, yeah, okay. Well, I believe that that's what Judge Garcia determined, because he asked several times stayed or lived. He keyed in on that word as well, and in his findings of fact, he determined that. If the district judge is thinking those are different words, that gives you trouble instead of gives you help. Well, it gives us help, I believe, because based upon that, Judge Garcia determined that the officers were reasonable in concluding from those statements of stayed that Mr. Nazareno, in fact, lived in the apartment. As for the defendant's parole status, when you boil it down, the argument really is that the Sacramento County Sheriff's Department detectives who are investigating thefts from a Target store in Sacramento were not reasonable in believing when the defendant said, I'm on parole, that he was on California parole. And I believe that that just doesn't pass the common sense test. They're in Sacramento investigating a Sacramento crime. They've got a young defendant, and they're asking if he's on parole. He understood what he was being asked. He didn't say, I'm on parole from Arizona or parole from New York. He knew what was being asked, and he answered the question, yes, I'm on parole. It was at that point that the officers took the defendant up to the apartment. In the apartment, once Detective Gillum had cleared it, made sure the scene was safe, he then called the parole officer and confirmed that the defendant was on parole and that that was his official address. We believe that was reasonable under the circumstances. And because the officers acted reasonably at both points with regard to both issues, we would respectfully ask this court to affirm the district court's denial of the suppression motion. Yes, Your Honor? No. No? There are no further questions? Okay, thanks very much. Thank you. Rebuttal? Yes, Your Honor. It's clear that parole searches are not allowed at third parties' homes just because the parolee visits there or is even an overnight guest there. And the problem, if this court were to rule that staying there is the same thing as living there, that creates that problem, which is that all of a sudden... I think all we need to do is rule that they had probable cause to believe that he was living there. Right. And on this record, the court can't. That's the issue. And the reason why the district court did over and over again ask the officer to clarify is because the district court was concerned that because of Officer Gillum's testimony, which was directly contradictory to Officer Scioli's testimony, that the court had concern that what we were talking about here was not enough. And so, again, I would urge the court to find it... The court had heard from the manager that there was a man living there. The court actually discredited the manager's testimony entirely in its ruling, so I don't... I think that if the court were to find that the district court were not clearly erroneous in its factual findings, that the manager's testimony becomes... The manager's testimony becomes a wash because the district court... Was it all of his testimony or was it the identification or ability to identify? I mean, the manager... Clearly, his testimony was not good with regard to saying who it was or even describing the individual. Right. Something a manager would be expected to know is, is there somebody living in the apartment complex? And I'm not sure that that was something that the courts required to disregard. And the manager testified that he basically told them he thought someone was staying there, but because it couldn't be identified as the defendant that he didn't know, he felt that there was a man staying there. Well, he said someone was living there, but he couldn't tell him who it was. So the manager said living. I think that's correct. In the testimony. Yeah. The manager... Yes. Your Honors, I'm running out of time. If the court has no further questions, we respectfully submit and ask the court to reverse the district court's denial of the motion to suppress. Thank you. Thank both sides for their helpful argument in this case. United States v. Nazareno submitted for decision. The next case on the argument calendar is Schwerin v. Knowles.
judges: Brunetti, Fletcher, Clifton